**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| ZHENQIU CHEN, Derivatively on Behalf of Nominal Defendant MICROSTRATEGY INCORPORATED d/b/a STRATEGY., | ) ) ) | |
| | ) | Case No. 1:25-cv-1066 |
| Plaintiff, | ) ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) ) | |
| MICHAEL J. SAYLOR, PHONG LE, ANDREW KANG, BRIAN P. BROOKS, JANE A. DIETZE, JARROD M. PATTEN, STEPHEN X. GRAHAM, CARL J. RICKERTSEN, GREGG J. WINIARSKI, and LESLIE J. RECHAN, | ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| MICROSTRATEGY INCORPORATED d/b/a STRATEGY, | ) ) ) | |
| Nominal Defendant. | ) ) | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Zhenqiu Chen ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant MicroStrategy Incorporated d/b/a Strategy ("Strategy" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's publicly available documents,

conference call transcripts and announcements made by the Company, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Ready Capital, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class action captioned *Hamza v. MicroStrategy Incorporated d/b/a Strategy et al.*, Case No 1:25-cv-00861-AJT-WEF (E.D. Va.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf of Strategy against certain of its current and former officers and members of the Company's Board (collectively, the "Individual Defendants")[1] for breaches of their fiduciary duties between at least April 30, 2024 to April 4, 2025, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2.      Strategy is a Bitcoin Treasury Company that utilizes cryptocurrency as its primary reserve asset. Cryptocurrencies are digital assets which utilize cryptography to conduct secure financial transactions. Cryptocurrencies operate on a decentralized and distributed ledger technology known as a "blockchain." Bitcoin uses an open-source protocol and is collectively maintained through a peer-to-peer network of decentralized user nodes

3.      The Company uses proceeds from equity and debt financings, as well as cash flows from its operations, to strategically accumulate Bitcoin and advocate for its role as digital capital. The Company's treasury strategy is designed to provide investors varying degrees of economic

---

[1] The Individual Defendants are Michael J. Saylor ("Saylor"), Phong Le ("Le"), Andrew Kang ("Kang"), Brian P. Brooks ("Brooks"), Jane A. Dietze ("Dietze"), Jarrod M. Patten ("Patten"), Stephen X. Graham ("Graham"), Carl J. Rickertsen ("Rickertsen"), Gregg J. Winiarski ("Winiarski"), and Leslie J. Rechan ("Rechan"). "Defendants" means Strategy and the Individual Defendants.

exposure to Bitcoin by offering a range of securities, including equity and fixed income instruments. The Company also provides artificial intelligence ("AI")-powered enterprise analytics software.

4.    During 2023, the Company acquired roughly 56,650 Bitcoin for approximately $1.902 billion, an average purchase price of $33,580 per Bitcoin. Between January 1, 2025, and February 14, 2025, the Company further acquired approximately 31,270 Bitcoin for approximately $3.165 billion, an average purchase price of $101,225 per Bitcoin. Strategy did not sell any Bitcoin during 2023, 2024, or between January 1, 2025, and February 14, 2025.

5.    Throughout the Relevant Period, the Individual Defendants repeatedly assured investors that Bitcoin was essential to the Company's strategies and operations, making numerous materially false and misleading statements and including Bitcoin yield ("Bitcoin Yield"), Bitcoin gain ("Bitcoin Gain"), and Bitcoin monetary gain ("Bitcoin $ Gain") "key performance indicators" ("KPI") of the Company.

6.    On January 1, 2025, Strategy enacted a proposal from the Financial Account Standard Board's ("FASB")[2] Accounting Standards Update No. 2023-08, which was titled *Intangibles—Goodwill and Other—Crypto Assets (Subtopic 350-60): Accounting for and Disclosure of Crypto Assets* (the "ASU 2023-08"). ASU 2023-08 instituted a new manner of accounting called the "fair value" accounting methodology, which required publicly traded companies to assess their cryptocurrency assets at their current fair market value price.

---

[2] The FASB is an independent, private-sector, not-for-profit organization recognized by the SEC as the designated accounting standard setter for public companies. The FASB develops and issues financial accounting standards through a transparent and inclusive process intended to promote financial reporting that provides useful information to investors and others who use financial reports. *See About the FASB*, Financial Accounting Standards Board, https://www.fasb.org/about-us/about-the-fasb (last visited Jun. 23, 2025).

7.     The Company reported to investors that the adoption of ASU 2023-08 would have a material impact on the Company's financial records, but failed to fully disclose the extent of the impact of ASU 2023-08 on the Company's financial records, namely that the Company could potentially realize substantial losses under the fair accounting methodology mandated by ASU 2023-08.

8.     However, the truth fully emerged on April 7, 2025, when the Company filed a Form 5-K with the SEC and disclosed that Strategy had recognized a $5.91 billion unrealized loss on its digital assets in the first quarter of 2025.

9.     On this news, Strategy's stock price fell $25.47 per share, or approximately 8.67%, to close at $268.14 per share on April 7, 2025.

10.     As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public.  Specifically, the Individual Defendants failed to disclose to investors that: (a) the adoption of ASU 2023-08 would have a much more substantial impact on the Company's finances than disclosed; (b) the risks associated with Bitcoin's volatility were greater than disclosed; (c) as a result, the Company's investment strategy and treasury options were substantially less profitable than represented; and (d) as a result of the foregoing, the Company's public statements regarding its business, operations, and financial prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

11.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls and failed to exercise adequate risk oversight.

12.     As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Saylor, Le, and Kang on May 16, 2025, in the United States District Court for the Eastern District of Virginia, exposing the Company to massive class-wide liability and costs related to defending itself in the Securities Class Action.

13.     Furthermore, during the Relevant Period, four of the Individual Defendants breached their fiduciary duties owed to the Company by making insider sales of Strategy's common stock while in possession of non-public information concerning the Company's financial condition and business prospects.

14.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

15.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Strategy's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section

27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein

for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15

U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC and

Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

17.     Plaintiff's claims also raise a federal question pertaining to the claims made in the

Securities Class Action based on violations of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

to 28 U.S.C. § 1367(a).

19.     This action is not a collusive action designed to confer jurisdiction on a court of the

United States that it would not otherwise have.

20.     In connection with the acts, conduct and other wrongs complained of herein, the

Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate

commerce, the United States mail, and the facilities of a national securities market.

21.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and

28 U.S.C. § 1391 because Strategy maintains its principal executive offices in this District,

Defendants have conducted business in this District, a substantial portion of the acts and omissions

alleged herein, including the dissemination of materially false and misleading information,

occurred in this District, Defendants have received substantial compensation in this District by

engaging in numerous activities that had an effect in this District, and the Securities Class Action

is pending in this District.

## PARTIES

*Plaintiff*

22.     Plaintiff is, and has been at all relevant times, a continuous shareholder of Strategy.

*Nominal Defendant*

23.     Nominal Defendant Strategy is a Delaware corporation with its principal executive offices located at 1850 Tower Crescent Plaza, Tysons Corner, Virginia 22182.  Strategy's common stock trades on the NASDAQ Global Select Market under the ticker symbol "MSTR."

*Individual Defendants*

24.     Defendant Saylor is the founder of the Company and has served as Chairman of the Board since 1989 and as Executive Chairman of the Company since August 2022. Saylor previously served as Chief Executive Officer ("CEO") of the Company from 1989 until August 2022. Saylor also serves on the Company's Investments Committee. According to the Company's proxy statement filed on a Schedule 14A with the SEC on April 28, 2025 (the "2025 Proxy"), Defendant Saylor received $791,912 in total compensation from the Company in 2024.

25.     Defendant Le has served as President, CEO, and a director of the Company since August 2022. Le previously served as President of the Company from May 2022 to August 2022, and in various other leadership roles at the Company since 2015. According to the 2025 Proxy, Defendant Le received $15,736,147 in total compensation from the Company in 2024.

26.     Defendant Kang has served as Executive Vice President and Chief Financial Officer ("CFO") of the Company since May 2022. According to the 2025 Proxy, Defendant Kang received $7,818,363 in total compensation from the Company in 2024.

27.     Defendant Brooks has served as a director of the Company since December 2024. According to the 2025 Proxy, Defendant Brooks received $25,000 in total compensation from the Company in 2024.

28.    Defendant Dietze has served as a director of the Company since December 2024. According to the 2025 Proxy, Defendant Dietze received $25,000 in total compensation from the Company in 2024.

29.    Defendant Graham has served as a director of the Company since April 2024. Graham also serves as Chair of the Company's Audit Committee and as a member of the Company's Investment Committee. According to the 2025 Proxy, Defendant Graham received $517,000 in total compensation from the Company in 2024.

30.    Defendant Patten has served as a director of the Company since November 2004. Patten also serves as a member of the Company's Audit Committee and Compensation Committee. According to the 2025 Proxy, Defendant Patten received $460,499 in total compensation from the Company in 2024.

31.    Defendant Rickertsen has served as a director of the Company since October 2002. Rickertsen also serves as Chair of the Company's Compensation Committee and as a member of the Company's Nominating Committee. According to the 2025 Proxy, Defendant Rickertsen received $476,886 in total compensation from the Company in 2024.

32.    Defendant Winiarski has served as a director of the Company since December 2024. Winiarski also serves as a member of the Company's Audit Committee. According to the 2025 Proxy, Defendant Winiarski received $25,000 in total compensation from the Company in 2024.

33.    Defendant Rechan served as a director of the Company from March 2018 until June 2025. Rechan also served as a member of the Company's Compensation Committee during the Relevant Period. According to the 2025 Proxy, Defendant Rechan received $472,380 in compensation from the Company in 2024.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

34.    By reason of their positions as officers and/or directors of Strategy, and because of their ability to control the business and corporate affairs of Strategy, the Individual Defendants owed Strategy and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Strategy in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Strategy and its shareholders.

35.    Each director and officer of the Company owes to Strategy and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

36.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Strategy, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

37.    To discharge their duties, the officers and directors of Strategy were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

38.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Strategy, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the

Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

39.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

40.     To discharge their duties, the officers and directors of Strategy were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Strategy were required to, among other things:

(i)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Virginia and the United States, and pursuant to Strategy's own Code of Conduct;

(ii)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how Strategy conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Strategy and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Strategy's operations would comply with all applicable laws and Strategy's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

41.    Each of the Individual Defendants further owed to Strategy and the shareholders the duty of loyalty requiring that each favor Strategy's interest and that of its shareholders over

their own while conducting the affairs of the Company and refrain from using their positions in Strategy, or knowledge of the affairs of the Company, to gain personal advantage.

42.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Strategy and were at all times acting within the course and scope of such agency.

43.     Because of their advisory, executive, managerial, and directorial positions with Strategy, each of the Individual Defendants had access to adverse, non-public information about the Company.

44.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Strategy.

## STRATEGY'S CODE OF CONDUCT

45.     The Company's Amended and Restated Code of Conduct, effective as of August 8, 2022 (the "Code of Conduct") applies to all of the Company's, and its majority owned and indirect subsidiaries, employees, officers, and Board members.

46.     Under a section titled "Ethical Standards," the Code of Conduct states:

MicroStrategy is committed to upholding the integrity of the Company through ethical business practices. Ethical conduct on the job is simply a matter of dealing fairly and honestly with MicroStrategy, its employees, service providers, customers, suppliers, partners, competitors, investors, and the public. In general, you should avoid any conduct that results in or gives the appearance that you are using your employment or relationship with MicroStrategy for personal gain.

You are expected to adhere to the following Company standards for activity in business-related locations or functions at all times.

- Engage in honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships

- Provide full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities

and Exchange Commission and in other public communications made by the Company

- Comply with applicable governmental laws, rules and regulations

- Provide prompt internal reporting of violations of the Code of Conduct to the appropriate person or persons indicated in this Code of Conduct and fully cooperate with Company investigations

- Maintain accountability for adherence to the Code of Conduct

- Treat customers, suppliers, and partners in a fair and honest manner

- Conduct the Company's business with integrity

- Maintain efficient, proper standards of work performance

- Maintain professional conduct during all Company business and events

- Adhere to all work-related written and verbal Company policies and instructions

- Maintain MicroStrategy business offices as clean and safe work environments

You should always judge a proposed course of conduct by reference to our ethical standards. The practical application of these standards is one of disclosure before taking action and asking for guidance when in doubt.

47.     Under a section titled "Safeguarding MicroStrategy's Assets," the Code of Conduct

states, in relevant part:

MicroStrategy has substantial assets. Company assets include not only funds, facilities, equipment, and inventory, but also intellectual property (such as patents, copyrights, and trademarks), trade secrets, and confidential data (such as customer, supplier, partner, financial, and pricing information). Our competitive success depends on your efforts to safeguard Company assets. We must maintain an adequate system of internal controls to help ensure that assets are safeguarded, transactions are executed in accordance with management's authorization, financial records are accurate and properly recorded, expense reports are proper and well documented, and violations of the Code of Conduct are detected and corrected. . . .

**Securities, Inside Information**
Use of material non-public or "inside" information about MicroStrategy or other publicly traded entities, including MicroStrategy's customers, suppliers, and

partners, for personal financial benefit by you or anyone else is strictly prohibited. You may not purchase or sell, directly or indirectly, securities while you possess material information not known to the public. Material information is generally considered to be information that an investor might consider important in deciding whether to buy, sell, or hold securities.

Other than as expressly permitted by the section of this Code of Conduct entitled "Public Communications," you may not disclose material non-public information to anyone outside of the Company, including family members. *Within the Company, you may disseminate material non-public information only to senior executives, members of the Board of Directors, and any other employees who need to know such information in connection with the performance of their Company duties.*

If you have a question as to whether certain information is material or whether it has been adequately disclosed to the public, you must contact the Legal Department and abstain from trading in the securities in question and disclosing the information to people outside the Company until you have been informed that the information is not material or has been publicly disclosed and digested. If you have reason to believe there has been an unintentional disclosure of material non-public information, contact the Legal Department immediately.

*For more information regarding MicroStrategy's policies on insider trading and disclosure of material non-public information, please reference the Insider Trading Policy and Public Communications Policy sections of the MicroStrategy Employee Handbook. . . .*

48.    Under a section titled "Business Practices and Relationships," the Code of Conduct states, in pertinent part:

**Conflicts of Interest**

MicroStrategy expects you to avoid any direct or indirect interest, investment, or association that is likely to interfere with your ability to use independent judgment in performing your duties as a MicroStrategy employee or service provider, as the case may be. A conflict of interest arises when you have a personal interest that influences or reasonably could be expected to influence your judgment or action in conducting the Company's business. This may put your objectivity in doubt when working with customers, suppliers, partners, competitors, or government officials. It is your responsibility to disclose any transaction, relationship, or other circumstance that constitutes a conflict of interest for you to the General Counsel, provided that if you are the General Counsel or an executive officer or director of MicroStrategy Incorporated, you should make such disclosure to the Audit Committee of the Board of Directors. Any such transaction, relationship, or circumstance fully disclosed to, and expressly approved by, the General Counsel or

the Audit Committee, as applicable, shall be deemed not to violate this Code of Conduct.

It is not possible to enumerate all situations that may present a conflict of interest. The facts of each case will determine whether there is a conflict. Such facts would include the amount of business involved, the extent to which you could influence the Company's decisions or the other party's decisions in the applicable matter, and the extent to which your objectivity, business judgment, or loyalty are affected, regardless of any actual or potential personal gain. For example, family relationships might influence your judgment either to your personal advantage or to the undue advantage of a relative. You must disclose to the General Counsel or the Audit Committee, as applicable, any circumstance in which you are aware that a relative has an interest in any Company transaction or has a material ownership interest in a customer, supplier, partner, or competitor, to the extent that such circumstance constitutes a conflict of interest for you. Generally, a material ownership interest will involve ownership of at least 5% of a company, although any ownership level coupled with other circumstances could constitute a conflict of interest for you if it would influence your objectivity, business judgment or loyalty. . . .

### Recording and Reporting Information

Under no circumstances may you report or record information that you know or suspect is false. It is a violation of Company policy to make false statements or to conceal a material fact in any communication to the Company, including financial records, expense reports, employment or employee benefit applications, statements made in connection with investigations or litigation, and any governmental reports. False reporting of information to people and organizations outside the Company, including customers, is strictly prohibited. For example, this prohibition applies to reports to auditors or investors, documents submitted to or maintained for government agencies, or documents containing product quality or pricing information. This prohibition is also critical in situations where the Company is selling goods to the government or to a customer that is selling goods to the government.

### Public Communications

The following persons (collectively, the "Authorized Public Spokespersons") are the only persons who are authorized to communicate on behalf of the Company by any means (for example, press interviews, press releases, electronic chat rooms, electronic discussion boards, social media forums, news groups, or any other forums accessible by persons other than Company employees and persons authorized by the Company) to the general public, the media, market professionals (e.g. securities analysts, institutional investors, investment advisers, brokers, and dealers), and securityholders:

- Executive Chairman,

- Chief Executive Officer,

- President,

- Chief Financial Officer,

- General Counsel, and

- their respective designees (but only in accordance with and to the extent provided by the applicable designation), including, but not limited to, the Chief Technology Officer and the Chief Marketing Officer.

Authorized Public Spokespersons may make disclosures of material non-public information only pursuant to a confidentiality arrangement approved by the Legal Department or by such other means that, after consultation with the Legal Department, are believed to be in compliance with Regulation FD and other applicable laws and stock exchange rules.

If you are not an Authorized Public Spokesperson:

- You must not communicate on behalf of the Company with the general public, the media, market professionals or securityholders. If you receive any inquiries from the general public, media, market professionals, or securityholders concerning the Company or its business, you should not respond to such inquires other than to refer the person making the inquiry to the Chief Marketing Officer, or other equivalent positions, or an Authorized Public Spokesperson. If you have the occasion to speak publicly on matters unrelated to the Company or its business, you may not give the appearance of speaking or acting on behalf of the Company.

- You must not disclose material non-public information to anyone outside of the Company unless such disclosure is (i) approved by management and (ii) pursuant to a confidentiality or other arrangement approved by the Legal Department.

- You must not disclose any proprietary or confidential information to anyone outside the Company except in the ordinary course of business as required in the performance of your Company duties and as otherwise permitted under this Code of Conduct.

- You must not post any messages, even on an anonymous basis, concerning the Company or otherwise containing Company information (financial or non-financial) to financial discussion boards or forums (for example, Google Finance or Yahoo! Finance).

The Company's policies regarding public communications do not prohibit or restrict you from engaging in any activities protected by the rules and regulations of the National Labor Relations Board or other applicable laws. In addition, the Company's policies regarding public communications do not prohibit or restrict any member of MicroStrategy's Board of Directors from acting in a manner required to satisfy such member's fiduciary duties to the Company.

*For more information regarding MicroStrategy's public communications policies, please reference the Public Communications Policy, the Social Media Policy, and the Insider Trading Policy sections of the MicroStrategy Employee Handbook. . . .*

### <u>STRATEGY'S AUDIT COMMITTEE CHARTER</u>

49.     Strategy's Audit Committee Charter states that the purpose of the Audit Committee

is to:

[R]eview the accounting and financial reporting process of the Company, the audits, both internal and external, of its financial statements, and the effectiveness of the Company's controls over financial reporting. The Audit Committee will make such examinations as are necessary to monitor the accounting and financial reporting and the internal and external audits of the Company and its subsidiaries, to provide to the Board the results of its examinations and recommendations derived therefrom, to outline to the Board improvements made, or to be made, in internal accounting controls, to nominate an independent registered public accounting firm (hereinafter, the "independent auditor"), and to provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require Board attention.

50.     Under the section titled "Responsibilities of the Audit Committee," the Audit

Committee Charter states:

The Audit Committee shall assist the Board in fulfilling its responsibilities to shareholders concerning the Company's accounting and financial reporting practices and audits of the Company's financial statements, and shall facilitate open communication between the Audit Committee, Board, independent auditor, and management. The Audit Committee shall discharge its responsibilities, and shall assess the information provided by the Company's management and the independent auditor, in accordance with its business judgment. The responsibilities set forth herein do not reflect or create any duty or obligation of the Audit Committee to plan, conduct, oversee, or determine the appropriate scope of any audit or to determine that the Company's financial statements are complete, accurate, fairly presented, or in accordance with Generally Accepted Accounting Principles in the United States or applicable law, or to guarantee the independent

auditor's reports. In exercising its business judgment, the Audit Committee shall rely on the information and advice provided by the Company's management and/or its independent auditor. Management is responsible for the preparation, presentation, and integrity of the Company's financial statements, for the appropriateness of the accounting principles and reporting policies that are used by the Company and for establishing and maintaining adequate internal control over financial reporting. The independent auditor is responsible for auditing the Company's financial statements and the Company's internal control over financial reporting and for reviewing the Company's unaudited interim financial statements.

51.    The Audit Committee Charter states that Strategy's Audit Committee has the following responsibilities, among others:

1.  The Audit Committee shall review and reassess the adequacy of this Charter at least annually.

2.  The independent auditor shall be accountable to the Audit Committee, which shall have the sole authority and responsibility to select, evaluate, and (where appropriate) replace the independent auditor. The Audit Committee may, in its discretion, seek stockholder ratification of the independent auditor the Audit Committee selects.

3.  The Audit Committee shall have sole and direct responsibility for setting the compensation of the independent auditor. The Audit Committee is empowered, without further action by the Board, to cause the Company to pay the compensation of the independent auditor established by the Audit Committee.

4.  The Audit Committee shall preapprove all audit services to be provided to the Company, whether provided by the independent auditor or other firms, and all other services (review, attest, and non-audit) to be provided to the Company by the independent auditor; provided, however, that de minimis non-audit services may instead be approved in accordance with applicable SEC rules. In situations where such a preapproval is needed between regularly scheduled Audit Committee meetings, the Chairperson of the Audit Committee (the "Chair") shall have the authority to consider and, if appropriate, preapprove audit, review, attest, and non-audit services. Any decision by the Chair to preapprove audit, review, attest, or non-audit services shall be presented to the full Audit Committee at its next scheduled meeting. The Audit Committee shall require the Company to make required disclosure in its SEC periodic reports relating to the approval by the Audit Committee of audit, review, attest, and non-audit services to be performed by the independent auditor and the fees paid by the Company for such services.

5.  The Audit Committee shall ensure that it receives and reviews from the

independent auditor the written disclosures and letter from the independent auditor required by the Public Company Accounting Oversight Board (the "PCAOB") regarding the independent auditor's communications with Audit Committee concerning independence.

6. The Audit Committee shall discuss with the independent auditor its independence and shall actively engage in a dialogue with the independent auditor regarding any disclosed relationships or services that might impact the objectivity and independence of the independent auditor. The Audit Committee shall take, or recommend that the Board take, appropriate action to oversee the independence of the independent auditor.

7. The independent auditor shall report directly to the Audit Committee, and the Audit Committee shall have sole and direct responsibility for overseeing the independent auditor, including resolution of disagreements between Company management and the independent auditor regarding financial reporting. In connection with its oversight role, the Audit Committee shall, from time to time as appropriate, receive and consider the reports and other communications required to be made by the independent auditor regarding:

   A. critical accounting policies and practices;

   B. alternative treatments within generally accepted accounting principles for policies and practices related to material items that have been discussed with Company management, including ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor;

   C. other material written communications between the independent auditor and Company management; and

   D. any other matters addressed in the applicable auditing standards of the PCAOB (the "PCAOB Auditing Standards").

8. The Audit Committee shall discuss with the independent auditor the independent auditor's judgments about the quality, not just the acceptability, of the Company's accounting principles as applied to its financial reporting. The discussion shall include such issues as the clarity of the Company's financial disclosures and the degree of aggressiveness or conservatism of the Company's accounting principles and underlying estimates and other significant decisions made by management in preparing the financial disclosure.

9. The Audit Committee shall review and discuss with the Company's management the Company's audited financial statements.

10. The Audit Committee shall discuss with the independent auditor the Company's

audited financial statements and the matters required to be discussed by the PCAOB Auditing Standards.

11. Based upon its discharge of its responsibilities pursuant to items 5 through 10 above and any other information, discussion, or communication that the Audit Committee in its business judgment deems relevant, the Audit Committee shall consider whether it will recommend to the Board that the Company's audited financial statements be included in the Company's annual report on Form 10-K.

12. The Audit Committee shall prepare for inclusion where necessary in a proxy or information statement of the Company relating to an annual meeting of security holders at which directors are to be elected (or special meeting or written consents in lieu of such meeting), the report described in Item 407(d) of Regulation S-K.

13. The Audit Committee shall annually inform the Company's independent auditor, Chief Financial Officer ("CFO"), Chief Accounting Officer ("CAO")/Controller, and the most senior Company employee (the "Company Internal Audit Lead") directly responsible for the Company's internal audit function ("Internal Audit") and the lead engagement partner with the external accounting firm responsible for Internal Audit (the "Internal Audit Service Provider") that they should promptly contact the Audit Committee or its Chair about any significant issue or disagreement concerning the Company's accounting practices or financial statements that is not resolved to their satisfaction. Where such communications are made to the Chair, he or she shall confer with the independent auditor concerning any such communications and shall notify the other members of the Audit Committee of any communications that the independent auditor or the Chair, in the exercise of his or her business judgment, believes should be considered by the Audit Committee prior to its next scheduled meeting.

14. The Audit Committee shall direct the independent auditor to use its best efforts to perform all reviews of interim financial information prior to disclosure by the Company of such information, and to discuss promptly with the Chair and the CFO any matters identified in connection with the independent auditor's review of interim financial information that are required to be discussed by applicable accounting rules and standards. The Chair shall discuss any such matters with the independent auditor, and shall notify the other members of the Audit Committee of any discussions that the independent auditor or the Chair, in the exercise of his or her business judgment, believes should be considered by the Audit Committee prior to disclosure or filing of the interim financial information or the Audit Committee's next scheduled meeting.

15. The Audit Committee shall direct management to advise the Audit Committee in the event that the Company proposes to publicly disclose or file interim

financial information prior to completion of review by the independent auditor.

16. The Audit Committee shall coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. The Audit Committee shall receive and review the certifications of the Company's Chief Executive Officer ("CEO") and CFO required by Rule 13a-14 under the Exchange Act.

17. The Audit Committee shall coordinate the Board's oversight of risk assessment and management, including data privacy and cybersecurity. Such oversight includes reviewing and discussing with management guidelines and policies to govern the process by which the Company's exposure to risk is handled and the potential impact of risk exposures on the Company's business, financial results, and operations.

18. The Audit Committee shall establish procedures for (i) the receipt, retention, and treatment of complaints received by the Company or any of its subsidiaries regarding accounting, internal accounting controls, or auditing matters, and (ii) the confidential, anonymous submission by employees of the Company or any of its subsidiaries of concerns regarding questionable accounting or auditing matters.

19. The Audit Committee shall conduct appropriate review and oversight of all "Related Person Transactions" (as defined in the Company's Related Person Transaction Policy) that are required to be reported under Item 404 of Regulation S-K on an ongoing basis and all such transactions shall be approved or, if the Audit Committee deems appropriate, ratified by the Audit Committee in accordance with the Related Person Transactions Policy.

20. The Audit Committee shall periodically discuss with the General Counsel (i) any legal matters that may have a material impact on the Company's financial statements, accounting policies, compliance with applicable laws and regulations and (ii) any material reports, notices or inquiries received from regulators or governmental agencies. The Audit Committee shall have direct communication with the General Counsel, as needed.

21. The Audit Committee shall meet privately at least once per year with the (i) independent auditor, (ii) CFO, (iii) CAO/Controller, and (iv) Company Internal Audit Lead. The Audit Committee shall meet at least quarterly with the Internal Audit Service Provider to discuss and evaluate the assessments by Internal Audit of the Company's risk management processes and system of internal control over financial reporting.

22. The Audit Committee shall have the authority, without further action by the Board, to engage and determine funding for such independent legal, accounting, and other advisors as it deems necessary or appropriate to carry out its

responsibilities. Such independent advisors may be the regular advisors to the Company. The Audit Committee is empowered, without further action by the Board, to cause the Company to pay the compensation of such advisors as established by the Audit Committee.

23. The Audit Committee is empowered, without further action by the Board, to cause the Company to pay the ordinary administrative expenses of the Audit Committee that are necessary or appropriate in carrying out its duties.

24. The Audit Committee shall review and reassess the adequacy of the Company's Code of Ethics for Designated Senior Financial Managers at least annually.

25. The Audit Committee shall take any actions that, in its sole discretion, it deems appropriate or necessary in order to assure the effectiveness, independence, and objectivity of Internal Audit. These actions include, but are not limited to:

A. annually reviewing and assessing Internal Audit's (i) assessments of the Company's risk management processes and system of internal control over financial reporting and (ii) budget for the current fiscal year (and reviewing and assessing any changes to any of the items referenced in the foregoing clauses);

B. annually reviewing and approving Internal Audit's audit plan for the current fiscal year;

C. annually reviewing and reassessing the Internal Audit Charter, as amended;

D. periodically reviewing and, in consultation with the Company's management, assessing the overall progress and effectiveness of Internal Audit in meeting the goals and objectives set forth in the audit plan for the current fiscal year (including any subsequent revisions thereto); and

E. reviewing and assessing management's decisions regarding the:

(i)     appointment, dismissal, and replacement of the Company Internal Audit Lead or the Internal Audit Service Provider;

(ii)    annual evaluation of the performance of the Company Internal Audit Lead, the Internal Audit Service Provider, and Internal Audit;

(iii)   compensation of the Company Internal Audit Lead; and

(iv)    engagement, compensation, and budget of the external accounting firm responsible for Internal Audit.

22

26. Management shall timely inform the Chair of the retirement, termination, or resignation of any Designated Senior Financial Manager (as defined in the Company's Code of Ethics for Designated Senior Financial Managers). The Chair may request an exit interview with such Designated Senior Financial Manager to be conducted by one or more members of the Audit Committee. The purpose of this interview is to invite the Designated Senior Financial Manager to share his or her concerns, criticisms, and recommendations for improvement, as they relate to:

A. the design and implementation of the Company's financial accounting and reporting policies, practices, or procedures;

B. the effectiveness of the Company's system of internal controls over financial reporting;

C. the effectiveness of the Audit Committee; and

D. any other matters that relate to the responsibilities of the Audit Committee, as outlined in items 1 through 25 of this section entitled "Responsibilities of the Audit Committee."

## **SUBSTANTIVE ALLEGATIONS**

### *Background*

52.     Strategy is a Bitcoin Treasury Company that utilizes cryptocurrency as its primary reserve asset. Cryptocurrencies are digital assets which utilize cryptography to conduct secure financial transactions. Cryptocurrencies operate on a decentralized and distributed ledger technology known as a "blockchain." Bitcoin uses an open-source protocol and is collectively maintained through a peer-to-peer network of decentralized user nodes

53.     The Company uses proceeds from equity and debt financings, as well as cash flows from its operations, to strategically accumulate Bitcoin and advocate for its role as digital capital. The Company's treasury strategy is designed to provide investors varying degrees of economic exposure to Bitcoin by offering a range of securities, including equity and fixed income instruments. The Company also provides AI-powered enterprise analytics software.

54.      During 2023, the Company acquired roughly 56,650 Bitcoin for approximately

$1.902 billion, an average purchase price of $33,580 per Bitcoin. Between January 1, 2025, and February 14, 2025, the Company further acquired approximately 31,270 Bitcoin for approximately $3.165 billion, an average purchase price of $101,225 per Bitcoin. Strategy did not sell any Bitcoin during 2023, 2024, or between January 1, 2025, and February 14, 2025.

55.     Throughout the Relevant Period, the Individual Defendants repeatedly assured investors that Bitcoin was essential to the Company's strategies and operations, making numerous materially false and misleading statements on the Company's finances and including Bitcoin Yield, Bitcoin Gain, and Bitcoin $ Gain as KPI of the Company.

56.     Then, on January 1, 2025, Strategy enacted FASB's ASU 2023-08. The stated purposes of ASU 2023-08 are to provide a better accounting method for cryptocurrency assets and to better capture the fair market value of these assets.

57.     To accomplish its stated purposes, ASU 2023-08 instituted the fair value accounting methodology, which requires publicly traded companies to assess their cryptocurrency assets at their current fair market value price. Therefore, publicly traded companies who have adopted ASU 2023-08 must report the gains and losses from fluctuations in the fair market value of their cryptocurrency assets as recognized in their net income during each reporting period.

58.     The fair market value accounting methodology is in contrast to the "cost-less-impairment" accounting methodology, which the Company previously used prior to adopting ASU 2023-08. The cost-less-impairment methodology treats cryptocurrency assets as intangible assets, requiring recognition of impairments only in the event of a price depreciation. Moreover, the cost-less-impairment methodology of accounting does not require a company to mark up its cryptocurrency assets for price increases unless the assets are actually sold.

59.     The Company reported to investors that the adoption of ASU 2023-08 would have

a material impact on the Company's financial records but failed to fully disclose the extent of the impact of ASU 2023-08 on the Company's financial records, namely that the Company could potentially realize substantial losses under the fair accounting methodology mandated by ASU 2023-08.

***Individual Defendants' Materially False and Misleading Statements***

60.     On April 29, 2024, the Company issued a press release announcing its financial results for the first quarter of 2024 (the "1Q24 Earnings Release"), which revealed that "[a]s of March 31, 2024, the carrying value of the Company's digital assets (comprised of approximately 214,278 bitcoins) was $5.074 billion, which reflects cumulative impairment losses of $2.461 billion since acquisition[.]" Defendant Kang was also quoted in the 1Q24 Earnings Release as stating, in relevant part:

> We acquired 25,250 additional bitcoins since the end of the fourth quarter, our 14th consecutive quarter of adding more bitcoin to our balance sheet. We believe that the combination of our operating structure, bitcoin strategy, and focus on technology innovation provides a unique opportunity for value creation for our shareholders. Year to date, the price of bitcoin appreciated significantly, spurred notably by the approval of the spot bitcoin exchange traded products which has increased institutional demand and resulted in further regulatory clarity[.]

61.     On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the first quarter of 2024 (the "1Q24 Earnings Call"). During the 1Q24 Earnings Call, Defendant Saylor highlighted the purported benefits of the Company's Bitcoin-driven investment strategy and operations, stating, in relevant part:

> Now MicroStrategy, if it had just simply adopted Bitcoin purely, perhaps it would have had the same performance as Bitcoin. But how do we actually outperform Bitcoin? ***I think the key here is volatility is a benefit to us. And so we have harnessed volatility***, and we've also harnessed our unique ability to issue securities such as convertible bonds. And the fact that we embrace the securitization of Bitcoin and we embrace the volatility of the asset class has given us the ability to raise capital, right? . . .

Bitcoin has digital property is a store of value, *but it's the emergent high performance, high volatility, high functionality, high utility store of value, and it's global. So we actually think that it's going to continue to grow from here.*

(Emphasis added).

62.    Defendant Kang also touted the Company's Bitcoin-centric strategy during the 1Q24 Earnings Call, stating, in relevant part, that the Company's "management team has demonstrated a strong track record of disciplined approach to navigate through volatile times in the Bitcoin market," and "that the combination of our operating structure, Bitcoin strategy, and focus on technology innovation provides a unique value proposition for shareholder value creation, when compared to other forms of exposure to Bitcoin."

63.    On May 1, 2024, the Company filed a quarterly report for the period ended March 31, 2024, on a Form 10-Q with the SEC (the "1Q24 10-Q"). In addition to affirming the previously reported financial results, the 1Q24 10-Q stated that the Company "expects the adoption of ASU 2023-08 will have a material impact on its consolidated balance sheets, statements of operations, statements of cash flows and disclosures" and that "[i]f the Company were to adopt [ASU 2023-08] during 2024, it estimates that its 2024 beginning retained earnings balance would increase by approximately $3.1 billion."

64.    Instead of detailing the impact ASU 2023-08 would have on the Company, the 1Q24 10-Q posed risks to the Company's financials as merely hypothetical, stating, in relevant part, that:

Due in particular to the volatility in the price of bitcoin, we expect the adoption of ASU 2023-08 will likely have a material impact on our financial results in future periods, increase the volatility of our financial results, and affect the carrying value of our bitcoin on our balance sheet, and could have adverse tax consequences, which in turn could have a material adverse effect on our financial results and the market price of our class A common stock. Additionally, as a result of ASU 2023-08 requiring a cumulative-effect adjustment to our opening balance of retained earnings as of the beginning of the annual period in which we adopt the guidance

and not permitting retrospective restatement of our historical financial statements, our future results will not be comparable to results from periods prior to our adoption of the guidance.

65.     The 1Q24 10-Q was signed by Defendant Kang and was accompanied by certifications made by Defendants Kang and Le pursuant to Rules 13a-14(a) and 15d-14(a) of the Exchange Act and the Sarbanes-Oxley Act of 2002 (the "SOX Certifications"), wherein they attested to the accuracy of the 1Q24 10-Q.

66.     On August 1, 2024, the Company issued a press release announcing its financial results for the second quarter of 2024 (the "2Q24 Earnings Release"), wherein the Company reported that "[a]s of June 30, 2024, the carrying value of the Company's digital assets (comprised of approximately 226,331 bitcoins) was $5.688 billion, which reflects cumulative impairment losses of $2.641 billion since acquisition and an average carrying amount per bitcoin of approximately $25,131." The 2Q24 Earnings Release also listed the following, among others, as "Second Quarter 2024 Financial Highlights":

> **Bitcoin Yield KPI:** BTC Yield is a key performance indicator ("KPI") that represents the % change period-to-period of the ratio between the Company's bitcoin holdings and its Assumed Diluted Shares Outstanding. Assumed Diluted Shares Outstanding refers to the aggregate of the Company's actual shares of common stock outstanding as of the end of the applicable period plus all additional shares that would result from the assumed conversion of all outstanding convertible notes, exercise of all outstanding stock option awards, and settlement of all outstanding restricted stock units and performance stock units. The Company uses BTC Yield as a KPI to help assess the performance of its strategy of acquiring bitcoin in a manner the Company believes is accretive to shareholders. The Company believes this KPI can be used to supplement an investor's understanding of the Company's decision to fund the purchase of bitcoin by issuing additional shares of its common stock or instruments convertible to common stock.

67.     In the 2Q24 Earnings Release, Defendant Le highlighted the Company's Bitcoin-focused strategy, stating, in relevant part:

> After yet another successful quarter for our bitcoin strategy, MicroStrategy today holds 226,500 bitcoins reflecting a current market value 70% higher than our cost

basis. We remain laser focused on our Bitcoin development strategy and intend to continue to achieve positive "BTC Yield," which is a new KPI that we are introducing, targeting 4-8% annually, over each of the next three years.

68.    Defendant Kang also highlighted the Company's Bitcoin holdings and strategy, stating, in relevant part:

Since the beginning of Q2, we grew our bitcoin holdings by adding 12,222 bitcoins through proceeds from our capital markets activities and excess cash. Additionally, we announced a 10-for-1 stock split earlier this month. We continue to closely manage our equity capital, and are filing a registration statement for a new $2 billion at-the-market equity offering program. Through our use of intelligent leverage, we have again achieved a "BTC Yield" of 12.2% year-to-date, which we believe demonstrates significant bitcoin accretion to shareholders.

69.    On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the second quarter of 2024 (the "2Q24 Earnings Call"). During the 2Q24 Earnings Call, Defendant Kang stated that after the Company's adoption of ASU 2023-08, "which requires fair value treatment of bitcoin holdings by Q1 of next year when the rule takes effect," that the Company "will realize the **benefit** of the significant difference between the difference between the market value and the carrying value of our balance sheet." (Emphasis added). Defendant Kang further stated that the Company had a "strong track record of applying a disciplined approach to navigate through volatile times in the bitcoin market" and that "the combination of our operating structure, bitcoin strategy, and focus on technology innovation provides a unique value proposition for shareholders when compared to other forms of bitcoin exposure."

70.    On August 6, 2024, the Company filed a quarterly report for the period ended June 30, 2024, on a Form 10-Q with the SEC (the "2Q24 10-Q"). The 2Q24 10-Q contained the same materially false and misleading statements regarding the adoption of ASU 2023-08 as the 1Q24 10-Q. *See* ¶¶ 63-64. The 2Q24 10-Q was signed by Defendant Kang and was also accompanied by

SOX Certifications made by Defendants Kang and Le, wherein they attested to the accuracy of the

2Q24 10-Q.

71.     On October 30, 2024, the Company issued a press release announcing its financial

results for the first quarter of 2024 (the "3Q24 Earnings Release"). Defendant Le was quoted in

the 3Q24 Earnings Release as stating:

> Our focus remains to increase value generated to our shareholders by leveraging the digital transformation of capital. Today, we are announcing a strategic goal of raising $42 billion of capital over the next 3 years, comprised of $21 billion of equity and $21 billion of fixed income securities, which we refer to as our "21/21 Plan." As a Bitcoin Treasury Company, we plan to use the additional capital to buy more bitcoin as a treasury reserve asset in a manner that will allow us to achieve higher BTC Yield[.]

72.     Defendant Kang also touted the Company's Bitcoin-focused strategy in the 3Q24

Earnings Release and was quoted as stating, in relevant part, that:

> Our proven track record of using intelligent leverage serves as the foundation to execute on our strategic three-year 21/21 Plan. Through our treasury strategy, we increased our bitcoin holdings by 11% in the quarter, increased our year-to-date BTC Yield to 17.8%, and reduced our total annualized interest expense by $24 million.

73.     The 3Q24 Earnings Release also included the following as "Bitcoin Treasury

Highlights," among others:

- **"BTC Yield" KPI:** Year-to-date 2024, the Company's BTC Yield is 17.8%. The Company is revising its long-term target to achieve an annual BTC Yield of 6% to 10% between 2025 and 2027. BTC Yield is a key performance indicator ("KPI") that the Company uses to help assess the performance of its strategy of acquiring bitcoin in a manner the Company believes is accretive to shareholders. See "Important Information about BTC Yield KPI" in this press release for the definition of BTC Yield and how it is calculated.

- **Digital Assets:** As of September 30, 2024, the carrying value of the Company's digital assets (comprised of approximately 252,220 bitcoins) was $6.851 billion. As of September 30, 2024, the original cost basis and market value of the Company's bitcoin were $9.904 billion and $16.007 billion, respectively, which reflects an average cost per bitcoin of

approximately $39,266 and a market price per bitcoin of $63,463, respectively.

74.    On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the third quarter of 2024 (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendant Saylor stated that the Company was confident in "the strength of our overall [Bitcoin] treasury strategy, and the strength of the Bitcoin market." Saylor continued to tout the Company's focus on Bitcoin, stating, in relevant part:

Bitcoin is proving that it is incredible. It is the strongest asset. MicroStrategy through its lot and with Bitcoin, but I'm happy to say here today that not only is MicroStrategy managed to become 100% Bitcoin.

We've managed to almost two times the performance of Bitcoin, and we've done it through taking advantage of our unique opportunities and our unique capabilities as an operating company to assume intelligent leverage, to sell volatility, and to manage our balance sheet. So this is just -- it's a great outcome. . . .

With the embrace of BTC yield, and the BCT yield shows that, in fact, we acquired the capital in a manner that was accretive to our shareholders as opposed to dilutive, and that means that when we're actually engaging in capital markets activity, we're doing it in a creative, high velocity fashion.

That, of course, is what is driving this trading volume, what's driving this open interest. And of course, because we have the volatility, many of the things we do are actually selling the volatility, recycling the proceeds of the volatility back into bitcoin and then delivering that to our shareholders in the form of a BTC yield. . . .

Our belief is that bitcoin is a solution to the problem that 95% of public companies have, and I guess 99% of private companies have, which is they don't have healthy balance sheets. Bitcoin fixes the balance sheet. It'll bring your stock back to life. It'll bring your options back to life.

It'll bring volatility. It'll everybody is negatively polarized to capital. We want to flip the switch and positively polarize them to capital. So unlike a lot of industries where you don't want competitors, in our business, we're happy to share the playbook.

We're happy to advocate. We'll show you how to do it. Everybody can win. There are no losers on the Bitcoin standard.

75.    During the 3Q24 Earnings Call, Defendant Kang also stated that the Company's

"track record of using equity, debt, and excess cash to acquire bitcoin as part of our treasury operations has resulted in value creation for our shareholders" and that "MicroStrategy has demonstrated a strong track record of applying a disciplined approach to navigate through volatile times in the bitcoin market."

76.    On October 31, 2024, the Company filed a quarterly report for the period ended September 30, 2024, on a Form 10-Q with the SEC (the "3Q24 10-Q"). The 3Q24 10-Q contained the same materially false and misleading statements regarding the adoption of ASU 2023-08 as the 1Q24 10-Q. *See* ¶¶ 63-64. The 3Q24 10-Q was signed by Defendant Kang and was also accompanied by SOX Certifications made by Defendants Kang and Le, wherein they attested to the accuracy of the 3Q24 10-Q.

77.    On February 5, 2025, the Company issued a press release announcing its financial results for the fourth quarter and full year for 2024 (the "4Q24 Earnings Release"), during which the Company highlighted that:

- 74.3% "BTC Yield" KPI achieved in FY 2024 and 2.9% in QTD 2025
- Revises annual BTC Yield target to a minimum of 15% for 2025
- Announces new "BTC Gain" and "BTC $ Gain" KPIs
- Announces an annual "BTC $ Gain" target of $10 billion for 2025

78.    Defendant Le was also quoted in the 4Q24 Earnings Release as stating, in relevant part, that "[l]ooking ahead to the rest of 2025, we are well-positioned to further enhance shareholder value by leveraging the strong support from institutional and retail investors for our strategic plan." Moreover, Defendant Kang was quoted in the 4Q24 Earnings Release as stating, in relevant part, that "2025 will take our evolution further with the introduction of the BTC $ Gain KPI and when we adopt fair value accounting for our bitcoin holdings with our Q1 results, transforming our financial results and bringing more transparency to the value generation and profitability of our treasury operations."

79. On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the fourth quarter and full year for 2024 (the "4Q24 Earnings Call"). During the 4Q24 Earnings Call, Defendant Saylor highlighted the Company's Bitcoin strategy, stating, in relevant part:

> We're dramatically outperforming the strategy of every other company in the S&P 500 with our Bitcoin strategy. Next slide. Here, you can see, at the end of the day, if you just bought Bitcoin, you would outperform 99% of the S&P 500. So, Bitcoin as pure digital capital is a very, very compelling investment idea. . . .
>
> Next, well, as you know, the secret, of course, to that strategy isn't just performance. It's also the volatility.
>
> Volatility is a measure of energy. And as you can see, Strategy is the most volatile stock out of the S&P 500 universe. So, we don't hide from it. We're quite proud of it.
>
> We engineer the business in order to stay volatile. Conventional wisdom is to strip volatility from a publicly traded company, strip it from the balance sheet, strip it from the P&L. MicroStrategy has embraced volatility. And not only do we pursue it with Bitcoin, but we pursue it with our leveraged strategies to actually get a volatility that's greater than the native Bitcoin volatility.
>
> There is a result of that volatility. And the result is liquidity and optionality.

80. Also during the 4Q24 Earnings Call, Defendant Kang discussed the adoption of ASU 2023-08 by the Company without acknowledging the risk to the Company, stating, in relevant part:

> And lastly, digital asset impairment charges in Q4 were approximately $1 billion and approximately $1.8 billion for the full year. I'm happy to announce that Q4 will be the last quarter where we will recognize an impairment charge on our Bitcoin holdings as we move to fair value accounting in Q1.

81. Defendant Kang went on to tout the Company's financial success in 2025, stating:

> Our BTC yield in 2024 of 74.3% surpassed the annual BTC yield in all of the previous years, as well as our initial target of 6% to 10% this year. We can't predict the price of Bitcoin nor can we predict broader equity and debt capital market conditions. However, we are confident that our Bitcoin treasury strategy will continue to generate value and are revising our targets for 2025 to achieve a

minimum of 15% BTC yield and a $10 billion BTC dollar gain for 2025.

82.    On February 18, 2025, the Company filed its annual report for 2024 on a Form 10-K with the SEC (the "2024 10-K"). The 2024 10-K stated that "[t]he Company expects the adoption of ASU 2023-08 will have a material impact on its consolidated balance sheets, statements of operations, statements of cash flows and disclosures" and that "[t]he Company estimates the adoption of ASU 2023-08 will increase its 2025 beginning retained earnings balance by approximately $12.745 billion, which reflects a $17.880 billion increase in digital assets, partially offset by a $3.969 billion increase in deferred tax liabilities, and a $1.166 billion decrease in deferred tax assets."

83.    The 2024 10-K also listed any risks to the Company's financials associated with the adoption as ASU 2023-08 as merely hypothetical, stating, in relevant part:

> As a result of our adoption of ASU 2023-08, we may incur greater losses during periods when we previously would have incurred smaller losses or no losses because we had already impaired the carrying value of our bitcoin to a low price observed during a prior period, and we may also incur gains during periods when the market value of bitcoin rises, as compared to periods prior to January 1, 2025, when we would not have incurred any gains under similar circumstances. Accordingly, due in particular to the volatility in the price of bitcoin, we expect the adoption of ASU 2023-08 to increase the volatility of our financial results. Additionally, as a result of ASU 2023-08 requiring a cumulative-effect adjustment to our opening balance of retained earnings as of January 1, 2025 and not permitting retrospective restatement of prior periods, our future results will not be comparable to results from periods prior to our adoption of the guidance.

84.    The 2024 10-K was signed by Defendants Le, Kang, Saylor, Brooks, Dietze, Graham, Patten, Rechan, Rickertsen, and Winiarski. The 2024 10-K was also accompanied by SOX Certifications made by Defendants Kang and Le, wherein they attested to the accuracy of the 2024 10-K.

85.    The statements contained above were materially false and misleading because the Individual Defendants failed to disclose, *inter alia*, that: (a) the adoption of ASU 2023-08 would

have a much more substantial impact on the Company's finances than disclosed; (b) the risks associated with Bitcoin's volatility were greater than disclosed; (c) as a result, the Company's investment strategy and treasury options were substantially less profitable than represented; and (d) as a result of the foregoing, the Company's public statements regarding its business, operations, and financial prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth is Revealed***

86.    The truth about the Company's finances, strategies, and operations emerged on April 7, 2025, when the Company filed a Form 8-K with the SEC and disclosed that Strategy had recognized a $5.91 billion unrealized loss on its digital assets in the first quarter of 2025. The Form 8-K stated, in relevant part:

> Although the Company continues to initially record its bitcoin purchases at cost, upon adoption of Accounting Standards Update No. 2023-08, *Intangibles—Goodwill and Other—Crypto Assets (Subtopic 350-60): Accounting for and Disclosure of Crypto Assets* ("ASU 2023-08") on January 1, 2025, any subsequent increases or decreases in fair value are recognized as incurred in the Consolidated Statements of Operations, and the fair value of the Company's bitcoin is reflected within the Consolidated Balance Sheets each reporting period-end. Our unrealized loss on digital assets for the quarter ended March 31, 2025 was $5.91 billion, which we expect will result in a net loss for the quarter ended March 31, 2025, partially offset by a related income tax benefit of $1.69 billion.

87.    The Form 8-K further revealed that:

> **We may not be able to regain profitability in future periods**
>
> We have generated net losses in recent periods, primarily due to digital asset impairment losses. As of January 1, 2025, we have adopted ASU 2023-08, pursuant to which we are required to recognize increases or decreases in fair value of our digital assets as incurred in our Consolidated Statements of Operations. Our unrealized loss on digital assets for the quarter ended March 31, 2025 was $5.91 billion, which we expect will result in a net loss for the quarter ended March 31, 2025. ***We may not be able to regain profitability in future periods, particularly if we incur significant unrealized losses related to our digital assets. As a result, our results of operations and financial condition may be materially adversely***

*affected*.

(Emphasis added).

88.     On news of this large unrealized loss, Strategy's stock price fell $25.47 per share, or approximately 8.67%, to close at $268.14 per share on April 7, 2025.

***Post-Relevant Period Developments***

89.     After the Relevant Period, on May 1, 2025, the Company issued a press release announcing its financial results for the first quarter of 2025, wherein the Company confirmed that it recorded a $5.9 billion unrealized loss on its digital assets during the quarter. During the accompanying earnings call the Company hosted for investors and analysts to discuss Strategy's financial results for the first quarter of 2025, Defendant Kang revealed that the adoption of ASU 2023-08 led to this loss, stating, in relevant part:

> One fundamental difference now under fair value accounting is that our holdings are marked on the last day of every quarter, not throughout the quarter as before. Any new Bitcoin purchased during the quarter were initially held at the purchase price of those Bitcoins and our prior quarter and new quarter purchases are fair valued as of the last day of each quarter. In Q1, the price of Bitcoin declined from approximately $93,400 at the end of the year to roughly $82,400 at the end of Q1, resulting in a $4.9 billion unrealized fair value loss on our pre-Q1 holdings.

> We also purchased throughout the course of Q1, an additional 80,715 bitcoin at an average price of approximately $94,900, representing $7.7 billion of new purchases. On the last day of Q1 because the market price of bitcoin was approximately $83,400, these new purchases also reflected a fair value decline of about $1 billion. As a result, our overall Q1 unrealized fair market value loss was $5.9 billion, which flowed directly through our income statement.

***Insider Sales***

90.     During the Relevant Period, Defendants Le, Kang, Graham, and Rechan made sales of Strategy's common stock while in possession of non-public information concerning the Company's financial condition and business prospects.

91.     While the Company's stock price was artificially inflated, Defendant Le sold

approximately 103,371 shares of Strategy common stock, totaling proceeds of over $15 million. On information and belief, Defendant Le made the following sales of Strategy common stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 8/16/2024 | 48,838 | $135.40 | $6,612,665.20 |
| 8/20/2024 | 50,000 | $138.28 | $6,914,000 |
| 11/14/2024 | 1,252 | $322.45 | $403,707.40 |
| 3/24/2025 | 3,281 | $329.26 | $1,080,302.06 |

92.    While the Company's stock price was artificially inflated, Defendant Kang sold approximately 7,885 shares of Strategy common stock, totaling proceeds of over $2.1 million. On information and belief, Defendant Kang made the following sales of Strategy common stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 11/6/2024 | 5,700 | $257.15 | $1,465,755 |
| 3/24/2025 | 2,185 | $329.26 | $719,433.10 |

93.    While the Company's stock price was artificially inflated, Defendant Graham sold approximately 50,000 shares of Strategy common stock, totaling proceeds of over $20.4 million On information and belief, Defendant Graham made the following sales of Strategy common stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 11/13/2024 | 30,000 | $381.24 | $11,437,200 |
| 11/21/2024 | 20,000 | $451.36 | $9,027,200 |

94.    While the Company's stock price was artificially inflated, Defendant Rechan sold approximately 55,000 shares of Strategy common stock, totaling proceeds of over $17 million. On information and belief, Defendant Rechan made the following sales of Strategy common stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 11/7/2024 | 20,000 | $275.42 | $5,508,400 |
| 11/11/2024 | 20,000 | $325.92 | $6,518,400 |
| 3/25/2025 | 15,000 | $335.90 | $5,038,500 |

95.     As a result of these insider sales, Defendants Le, Kang, Graham, and Rechan were unjustly enriched.

***Harm to the Company***

96.     As a direct and proximate result of the Individual Defendants' misconduct, Strategy has lost and expended, and will lose and expend, millions of dollars.

97.     Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Saylor, Le, and Kang, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

98.     Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

99.     Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

100.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

101.    Plaintiff will adequately and fairly represent the interests of Strategy and its shareholders in enforcing and prosecuting its rights.

102.    Strategy is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

103.    Plaintiff is a current shareholder of Strategy and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

104.    A pre-suit demand on the Board of Strategy is futile and, therefore, excused. At the time this action was commenced, the eight-person Board consisted of Individual Defendants Saylor, Le, Brooks, Dietze, Patten, Graham, Rickertsen, and Winiarski (the "Director Defendants"). Accordingly, Plaintiff is only required to show that four Director Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

105.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

106.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

107.    Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders,

authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

108.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims.  Specifically, as Board members of Strategy, the Director Defendants knew, or should have known, the material facts surrounding Strategy's financial condition and internal control mechanisms.

109.    Defendant Le is not disinterested or independent. In addition to being a director, Defendant Le serves as President and CEO of the Company. Thus, as stated in the 2025 Proxy, the Company admits that Defendant Le is a non-independent director. Furthermore, Defendant Le is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

110.    Defendant Saylor is not disinterested or independent. In addition to being a director, Defendant Saylor is the founder of the Company, serves as Chairman of the Board and Executive Chairman of the Company, and previously served as CEO and President of the Company. Thus, as stated in the 2025 Proxy, the Company admits that Defendant Saylor is a non-independent director. Furthermore, Defendant Saylor is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

111.    Moreover, Director Defendants Le, Saylor, Brooks, Dietze, Graham, Patten, Rickertsen, and Winiarski each signed the 2024 10-K. Accordingly, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile, and, therefore, excused.

112.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Furthermore, Director Defendants Le and Graham each made insider sales of the Company's common stock while the price was artificially inflated as a result of the materially false and misleading statements alleged herein.

113.    All of the Board's current members derive substantial revenue from the Company, control the Company, and, as detailed above, are indebted to each other and the Company. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct.

114.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.  As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

115.    Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

116.    Defendants Dietze, Graham, Patten, and Winiarski (the "Audit Defendants") serve on the Company's Audit Committee, and pursuant to the Audit Committee Charter, were

specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting.  At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above.  Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

117.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct.  The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct.  The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

118.    Accordingly, a pre-suit demand on the Board is futile and excused.

### COUNT I
### Against the Individual Defendants
### For Breach of Fiduciary Duty

119.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

121.    Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

122.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

123.    Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (a) the adoption of ASU 2023-08 would have a much more substantial impact on the Company's finances than disclosed; (b) the risks associated with Bitcoin's volatility were greater than disclosed; (c) as a result, the Company's investment strategy and treasury options were substantially less profitable than represented; and (d) as a result of the foregoing, the Company's public statements regarding its business, operations, and financial prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

124.    The Individual Defendants had actual knowledge that the Company was engaging

42

in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

125.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

126.    Furthermore, four of the Individual Defendants engaged in insider sales during the Relevant Period while the price of the Company's stock was artificially inflated, netting millions of dollars in proceeds for themselves.

127.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

128.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

129.    Plaintiff, on behalf of Strategy, has no adequate remedy at law.

## COUNT II
### Against the Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

130.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

132.    Plaintiff on behalf of Strategy has no adequate remedy at law.

## COUNT III
### Against the Individual Defendants for Unjust Enrichment

133.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Strategy.

135.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Strategy that was tied to the performance or artificially inflated valuation of Strategy, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

136.    Plaintiff, as a shareholder and a representative of Strategy, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and

other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

137.    Plaintiff on behalf of Strategy has no adequate remedy at law.

## COUNT IV
### Against the Individual Defendants for Waste of Corporate Assets

138.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

140.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

141.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

142.    Plaintiff, on behalf Strategy, has no adequate remedy at law.

## COUNT V
### Against Defendants Saylor, Le, and Kang
### for Contribution Under Sections 10(b) and 21D of the Exchange Act

143.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144.    Strategy and Defendants Saylor, Le, and Kang are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the

SEC. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to Defendants Saylor's, Le's, and Kang's willful and/or reckless violations of their obligations as officers and/or directors of Strategy.

145.    Defendants Saylor, Le, and Kang, because of their positions of control and authority as officers and/or directors of Strategy, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of Strategy, including the wrongful acts complained of herein and in the Securities Class Actions.

146.    Accordingly, Defendants Saylor, Le, and Kang are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

147.    As such, Strategy is entitled to receive all appropriate contribution or indemnification from Defendants Saylor, Le, and Kang.

148.    Plaintiff, on behalf Strategy, has no adequate remedy at law

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their

unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock

sale proceeds, and imposing a constructive trust thereon;

      C.     Awarding punitive damages;

      D.     Awarding costs and disbursements of this action, including reasonable attorneys'

fees, accountants' and experts' fees, costs, and expenses; and

      E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

DATED: June 25, 2025            **SPIRO & BROWNE, PLC**

           By:   */s/ David G. Browne*
                David G. Browne (VSB No. 65306)
                SPIRO & BROWNE PLC
                2400 Old Brick Road
                Glen Allen, VA 23060
                Telephone: (804) 573-9220
                Email: dbrowne@sblawva.com

                *Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Vincent A. Licata
Leah B. Wihtelin
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sdr@rl-legal.com
      vl@rl-legal.com
      lw@rl-legal.com